Filed 6/27/14

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| ZAHRA NASER,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>LAKERIDGE ATHLETIC CLUB,<br><br>        Defendant and Respondent. | A138353<br><br>(Contra Costa County<br>Super. Ct. No. MSC11-00211) |

Appellant Zahra Naser slipped and fell in the locker room of the Lakeridge Athletic Club (Lakeridge) in El Sobrante, California. She filed suit seeking damages for resulting personal injuries. The trial court granted summary judgment for Lakeridge on the basis that Naser had assumed the risk of harm in use of the health club facilities and that her contract with Lakeridge included a valid release of liability. Naser appeals from the judgment against her, contending the liability waiver in her membership agreement is unenforceable under statutes governing contracts for health studio services (Civ. Code, § 1812.80 et seq.; hereafter Health Studio Act), and the agreement did not clearly and unambiguously relieve Lakeridge of negligence liability for injuries not arising directly from exercise activities. She also challenges the trial court's denial of her motion to tax costs awarded to Lakeridge. We affirm the grant of summary judgment in the unpublished portion of this opinion. In the published portion of this opinion we affirm denial of Naser's motion to tax costs.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.A.

1

# I.    BACKGROUND

Except as noted, the following facts were undisputed for purposes of the summary judgment proceeding.  In February 2004, Naser signed a membership agreement (Agreement) with Lakeridge and became a member of the club.  The Agreement stated on its first page in bold print:  "The Member is fully aware of the potential dangers incidental in engaging in the activity and instruction of exercise activities (such as weight lifting, bodybuilding, aerobic dancing, and any other exercise activity).  In consideration of permitting this member to join this Club or to participate in exercise activity and/or instruction at these premises (including the entire indoor area and outdoor parking area), the Member agrees to voluntarily assume all liability and to indemnify [Lakeridge] for any death, injury, or damage suffered by any person, including the Member, arising out of the Member's activities at [Lakeridge] even if death, injury, or damage is caused by [Lakeridge's] own passive or active negligence."  (Boldface omitted.)  Immediately below this release of liability (Release) and just above Naser's signature on the first page of the form, the Agreement stated in bold print:  "The Member acknowledges that he or she has read and understands the entire Agreement consisting of two (2) pages including this page, and the Club Rules and Regulations.  The Member is fully aware of the legal consequences of signing this Agreement.  This Agreement supercedes [*sic*] any and all previous Agreements."  (Boldface omitted.)  Naser signed the Agreement on February 24, 2004.

On January 26, 2009, Naser went to the club, changed in the locker room, swam in the pool, and spent time in the sauna.  "After she got out of the sauna, [she] walked back to the locker room, still wearing her flip flop shoes, to get her bag and clothes out of her locker. [¶] . . . [She] grabbed her bag and turned to put it on the bench behind her.  She took one step into a puddle of water and her left foot came off the protective floor mat, and her knee hit the floor.[1] [¶] . . . At the time of the accident, the locker room was

---

[1] Lakeridge argued Naser's testimony was unclear as to the manner of her fall.

2

divided into almost two parts by three benches, with mats adjacent to the lockers but no matting next to the benches."

Naser's suit pled a single cause of action for personal injury. She alleged that Lakeridge negligently supervised, maintained, repaired, cleaned, controlled and operated the premises. Lakeridge moved for summary judgment on the ground that by signing the Agreement Naser agreed to voluntarily assume all liability for any injury she might suffer as a result of her activities at the club, which included her 2009 slip and fall. In opposition, Naser argued the Release was not enforceable because the Agreement violated the Health Studio Act, specifically Civil Code sections 1812.81, 1812.84, and 1812.91. Even if the Agreement did not violate the Health Studio Act, she argued the Release did not apply to the incident because her injury was not exercise-related and the Release was also void for ambiguity.

The trial court granted the summary judgment motion, finding the Agreement did not violate the Health Studio Act and the Release was enforceable. The Release applied to Naser's accident because her slip and fall on a wet locker room floor was "the type of typical hazard known to relate to the use of a health club facility for exercise." The court entered judgment for Lakeridge, and denied Naser's subsequent motion to tax Lakeridge's costs, which included $895 in filing fees, a $150 jury fee, and $8,602 in deposition costs. Naser appeals both the judgment and the cost award.

## II.  DISCUSSION

A.  *Motion for Summary Judgment*[*]

Naser's written release of liability is an affirmative defense.[2] (*Eriksson v. Nunnink* (2011) 191 Cal.App.4th 826, 856.) " 'If the moving defendant argues that it has a

---

[*] See footnote, *ante*, page 1.

[2] Naser argues Lakeridge forfeited this defense by failing to plead the Release as an affirmative defense in its answer to her complaint. Naser's argument is forfeited because it was raised for the first time on appeal. (*Ward v. Taggart* (1959) 51 Cal.2d 736, 742.) In any event, Lakeridge did plead express waiver of liability by a written release as an affirmative defense: Lakeridge alleged that Naser "waived, expressly or by implication, [her] right to maintain the action" and "expressly waived and released any

3

complete defense to the plaintiff's cause of action, the defendant has the initial burden to show that undisputed facts support each element of the affirmative defense. Once it does so, the burden shifts to plaintiff to show an issue of fact concerning at least one element of the defense. [Citation.] If, in anticipation of an affirmative defense, the complaint alleges facts to refute it, the pleadings themselves create "a material issue which defendant[] would have . . . to refute in order to obtain summary [judgment]." [Citation.]' . . . 'A plaintiff is not required to anticipate such a defense [citation]; instead, the defendant bears the burden of raising the defense and establishing the validity of a release *as applied to the case at hand.*' [Citation.]" (*Ibid.*)

    1.    *The Health Studio Act*

Naser argues the Release in the Agreement is not enforceable because the Agreement failed to comply with Civil Code section 1812.84, subdivision (b). Lakeridge does not dispute that the Agreement was a "contract for health studio services" within the meaning of the Health Studio Act . (See Civ. Code, § 1812.81.) Section 1812.84, subdivision (b) requires such a contract to "include a statement printed in a size at least 14-point type that discloses the length of the term of the contract. That statement shall be placed above the space reserved for the signature of the buyer." A noncompliant contract is "void and unenforceable as contrary to public policy." (Civ. Code, § 1812.91.)

At the bottom of Naser's Agreement is a text box with the heading "For Office Use Only." (Capitalization omitted.) Within that text box are three lines in a column that are printed in large boldface print: "Annual Term Agreement (12 Months)," "Month-to-Month Agreement," and "Other Term," followed by an "Applicant Signature" line. A checkbox next to "Annual Term Agreement (12 Months)" has been checked and Naser has signed on the applicant's signature line.

---

and all claims and liabilities against [Lakeridge] pursuant to a written release." Naser cites no authority that requires the defense to be pleaded with greater specificity or supports reversal of a judgment for failure to plead the defense with greater specificity. (See *Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 240 [defect in pleading should be disregarded unless the pleading fails to give sufficient notice to the other party that it may prepare its case].)

a.    *Fourteen-Point Type*

In the trial court, Naser asserted without analysis that the Agreement did not comply with the 14-point type requirement.  In its reply brief, Lakeridge responded that "a simple glance" at the Agreement showed "the phrase 'Annual Term Agreement (12 Months)' in large bold font."  It drew the court's attention to a "true and correct copy of the full size agreement" that it submitted with its reply brief.  That copy, however, was the same size (8.5 x 11 inches) as the copy of the Agreement that was already in the record.

In a tentative decision issued before the hearing on the motion, the court wrote, "The length of the term of [Naser's] Agreement is printed in what appears to be 14-point type on the first page of the Agreement."  At the hearing, Naser's counsel objected to consideration of the new copy of the Agreement as hearsay and lacking in foundation.  Defense counsel explained that the new copy was submitted merely to demonstrate its actual size.  When the court consulted its file, it discovered that the new copy was the same size as the original copy.  "[I]f you were trying to do that [i.e., demonstrate the Agreement's actual size], you didn't accomplish it.  So the only one that I have got to consider as part of the record is the same one as the old one."  Defense counsel then said, "But it's still in 14-point font," and the court agreed.  In its final ruling, the court again wrote that the relevant text "is printed in what appears to be 14-point type."

Naser argues on appeal that the Lakeridge's attempt to submit a new copy of the Agreement in support of its reply papers was improper.  The record clearly indicates, however, that the court disregarded the larger version of the Agreement and based its ruling solely on the identical 8.5-by-11-inch copies in the record, which included the copy that was properly submitted in support of the Lakeridge's summary judgment motion.  There was no error.[3]

---

[3] When Lakeridge filed its respondent's brief on appeal, it filed a document entitled "Exhibits A and B to Respondent's Opening Brief."  Exhibit A includes copies of a request for admissions from Lakeridge to Naser, as well as Naser's response.  Attached to the request for admissions is an 8.5-by-14-inch copy of the Agreement.  In its

On the merits, Naser again baldly asserts the relevant text in the Agreement "plainly do[es] not contain 14 point type."[4] She provides no factual or legal analysis to challenge the court's implied conclusion that the undisputed evidence demonstrated the relevant text on the 8.5-by-11-inch copies of the Agreement was 14-point type. Therefore, she has forfeited her argument. (*Guthrey v. State of California* (1998) 63 Cal.App.4th 1108, 1115–1116 [claim on appeal may be denied if unsupported by argument applying legal principles to particular facts of the case].)

In any event, the trial court's conclusion appears to be correct. The Michigan Supreme Court recently examined the meaning of a statutory requirement that text be printed in 14-point type. (*Stand Up for Democracy v. Secretary of State* (2012) 492 Mich. 588 [822 N.W.2d 159].) A majority of the court concluded in that the point size of type is the distance from the bottom of one line of text to the bottom of the next line of text in a column: point size traditionally refers to the height of a block of type (not the height of individual letters) and thus includes space that separates lines of text. Because one "point" equals 1/72 of an inch, "14-point type" is text that measures 14/72

---

respondent's brief, Lakeridge cites this exhibit as evidence that the true size of the original Agreement was 8.5 by 14 inches rather than 8.5 by 11 inches. Naser asks us to strike the exhibits and to disregard all references to and arguments based on the exhibits in Lakeridge's brief. We grant Naser's request. No rule authorizes a party's submission of "exhibits" in support of its briefs. Although California Rules of Court, rule 8.204(d) authorizes "attachments" to briefs, the plain language of the rule limits those attachments to materials that are in the appellate record or copies of statutes and rules that are not readily accessible by the court. Exhibit A is not material from the appellate record and exhibit B consists of copies of California statutes that are readily accessible by the court. The exhibits are stricken and the court will disregard references to and arguments based on exhibit A in Lakeridge's appellate brief. (See *Pulver v. Avco Financial Services* (1986) 182 Cal.App.3d 622, 631–632 [disregarding an improper appendix as well as arguments in the brief that were based on the appendix].)

[4] Naser inaccurately states that "the trial judge acknowledged this deficiency [in point size] but chose to ignore it." The trial judge acknowledged that the second copy of the Agreement submitted by Lakeridge was the same size as the first copy. The court did not state that the type size of the relevant text on the copies in the record was less than 14-point type. On the contrary, the court found that the relevant text appeared to be printed in 14-point type.

of an inch (0.19 inch) from the bottom of one line of text to the bottom of the next line of text. (*Id.* at pp. 608–615 (plur. opn. of Kelly, J.); *id.* at pp. 624–629 (conc. opn. of Young, J.).) The actual distance between the bottom of the "Annual Term Agreement (12 Months)" line of text and the following "Month-to-Month Agreement" line of text underneath it (which plainly is printed in the same font type and size) is a proper subject of judicial notice. (Evid. Code, § 451, subd. (f).) By our measure, the distance between these lines on the 8.5-by-11-inch copies of the Agreement in the record is approximately 3/16 of an inch or 0.19 inches—i.e., 14-point type. Even ignoring indications in the record that the actual Agreement was larger than 8.5 by 11 inches, and setting aside potentially applicable principles of substantial compliance, the court's finding on undisputed facts that the text was 14-point type is supported by the summary judgment record.

        b.     *Length of Term*

Naser argued below that the Agreement failed to comply with Civil Code section 1812.84, subdivision (b) because "more than three years had elapsed between the time she initially signed up for membership and the time the incident occurred." Lakeridge replied below that the Agreement did not violate Civil Code section 1812.84, *subdivision* (*a*), which limits the length of a contract term to three years. Lakeridge explained that the initial term of the Agreement "is for one year, and thereafter by the month so long as [Naser] keeps her membership dues current," as "[is] made clear . . . on page two, which states that the contract is month-to-month [once] the initial term expires." In its tentative decision, the court wrote that the Agreement did not violate Civil Code section 1812.84, *subdivision* (*a*) for the reasons stated by Lakeridge. At hearing on the motion, Naser clarified that her complaint was that the actual term of the contract was not printed in 14-point type above the signature line as required by Civil Code section 1812.84, subdivision (b). "[Lakeridge's] argument . . . is that this is a 12-month contract, and that converts into a month-to-month contract. If that's what [Lakeridge] intended . . . , they should have checked 'annual term agreement' as well as 'month-to-month agreement,' or they should have checked 'other term' and written in

7

12 months' agreement followed by month-to-month. They didn't do that. . . . [¶] Now, if you look on the flip side of the [A]greement, . . . in approximately 6-point font, there are some words that modify this and say actually it's a 12-month agreement that converts into a month-to-month agreement. But [Civil Code section 1812.84, subdivision (b)] requires that this information be in large font on the front [p]age. . . . [¶] . . . [¶] The only thing that complies with the code is 12 months[;] therefore [the] defense should be limited to claiming the exculpatory provisions of this contract for 12 months." The trial court adhered to the tentative decision.

Naser argues in her opening brief that the Agreement violates the Health Studio Act because "more than three years elapsed between the time she initially signed up for membership and the time the incident occurred." However, Naser provides no analysis of this issue and she does not argue that the trial court erred in analyzing the issue under subdivision (a) rather than subdivision (b) of Civil Code section 1812.84. The issue, therefore, is forfeited. (*Guthrey v. State of California, supra,* 63 Cal.App.4th at pp. 1115–1116.) In her reply brief, Naser argues the Agreement violated Civil Code section 1812.84, *subdivision* (*a*) because it effectively had a term of more than three years. This argument is forfeited because it was raised for the first time in Naser's reply brief. (See *REO Broadcasting Consultants v. Martin* (1999) 69 Cal.App.4th 489, 500.) The argument appears to be meritless in any event, as the Agreement provides that the term of the contract would continue on a month-to-month basis after the initial term expired if Naser continued to pay her fees, and Civil Code section 1812.98 expressly provides that "[n]othing in this title is intended to prohibit month-to-month contracts."[5]

---

[5] Naser also states in her reply brief that the "Agreement itself contains no language signed or acknowledged by NASER regarding the length of time the [A]greement would be in effect," and that the reference to the term of the Agreement in the "For Office Use Only" text box at the bottom of the first page of the contract "is not something that [Naser] signed, initialed, or acknowledged in any way." This statement is not supported by the record. A signature appears below the language "Annual Term Agreement (12 Months)" and on an "Applicant Signature" line that is accompanied by the language, "Signature represents acknowledgement and agreement to the length of the term of the contract," with the word "acknowledgement" underlined in handwriting. The

8

2.    *Release from Liability*

Naser challenges enforceability of the Release on two additional grounds.

a.    *Conspicuousness*

Naser argues the Release was unenforceable because it was not conspicuously displayed on the Agreement as required by *Leon v. Family Fitness Center (#107), Inc.* (1998) 61 Cal.App.4th 1227, 1230 (*Leon*).  This argument is forfeited because it was not raised below.  Although Naser claims she raised the issue in the trial court, she cites only to her argument below that *the length-of-term language* in the Agreement *did not comply* with Civil Code section 1812.84, subdivision (b).  Her argument that the *Release language* was not sufficiently *conspicuous* to be enforceable is a distinct legal and factual argument that she cannot raise for the first time on appeal.  (*Ward v. Taggart, supra,* 51 Cal.2d at p. 742.)  In any event, we note that the Release language was printed in boldface (albeit in a small type size) as a separate paragraph in the middle of the first page of the Agreement just above a signature line, and that it ends with language designed to alert the potential signatory that he or she will release Lakeridge from liability for its own negligence.  (Cf. *Leon,* at pp. 1231, 1233 [release language was located on bottom left of front page of contract, undifferentiated by surrounding text (small type size, no boldface, no heading) except by paragraph separation, and did not include language alerting the reader that the club intended to exculpate itself for its own negligence].)

---

signature appears to be identical to the signature under the Release, which Naser does not deny signing.  Indeed, the signature appears to read, "Z. Naser."  Therefore, it plainly appears that Naser signed the acknowledgement of the length of the Agreement's term.

Naser writes that "the March 1, 2004 date on this section is four days after [she] signed the document itself," but in fact the date February 24, 2004 (the same date accompanying Naser's other signature and initials on the front page of the Agreement) is written on the "Date of Membership" line.  That date is then crossed out, with March 1, 2004 written above the crossed-out date.  Far from suggesting that Naser never signed the acknowledgement of the term of the contract, these markings suggest Naser signed the acknowledgement at the same time she signed the rest of the Agreement, but that the official date that her membership commenced was postponed until the first of the following month.

b.      *Scope of the Release*

Naser next argues that the Release is not enforceable in her case because it did not clearly and unambiguously relieve Lakeridge of liability for negligence unrelated to exercise activity.  The trial court disagreed.  Although it concluded the Release was tied to use of the club for exercise activity, the court concluded that Naser's injury fell well within that scope:  "Because the phrase 'arising out of the Member's activities at Lakeridge' refers to the Member's 'exercise activities and instruction,' the intent and effect of the last phrase of the release concerning Lakeridge's negligence is to release Lakeridge only from claims of personal injury resulting from use of the health club for fitness related activity. [¶] The facts are undisputed that [Naser] slipped and fell on water in the locker room. [Citation.]  The locker room was used by all members, including those that used the facilit[y's] pool and were wet.  [Naser] herself had just left the pool and sauna and was attempting to change out of her swimsuit when she fell.  [Citation.] Slipping and falling in a wet locker room is the type of typical hazard known to relate to the use of a health club facility for exercise.  (See [*Leon, supra,*] 61 Cal.App.4th [at p.] 1234.)"

Providers of sports or recreation activities ordinarily bear liability only for negligence that increases the inherent risks of such activity.[6]  But a written release of liability may exculpate the provider from even that duty.  (*Benedek v. PLC Santa Monica* (2002) 104 Cal.App.4th 1351, 1356–1357 (*Benedek*); *Zipusch v. LA Workout, Inc.* (2007) 155 Cal.App.4th 1281, 1288; *Capri v. L.A. Fitness International, LLC* (2006) 136 Cal.App.4th 1078, 1084 (*Capri*).)  Such a release is sometimes referred to as " 'express assumption of risk.' "  (See *Knight v. Jewett, supra,* 3 Cal.4th at pp. 308–309, fn. 4.)

---

[6] Under the doctrine of primary assumption of risk, a defendant generally has no legal duty to eliminate (or protect a plaintiff against) risks inherent in the sport itself, but is liable only for negligence that *increased* the inherent risks "over and above those inherent in the sport."  (*Knight v. Jewett* (1992) 3 Cal.4th 296, 315–316.)  Lakeridge here, however, relies only on the Release as a defense to liability.

10

"Contract principles apply when interpreting [such] a release, and 'normally the meaning of contract language, including a release, is a legal question.' [Citation.] . . . [¶] A written release may exculpate a tortfeasor from future negligence or misconduct. [Citation.] To be effective, such a release 'must be clear, unambiguous, and explicit in expressing the intent of the subscribing parties.' [Citation.] The release need not achieve perfection. [Citation.] . . . [¶] The determination of whether a release contains ambiguities is a matter of contractual construction. [Citation.] 'An ambiguity exists when a party can identify an alternative, semantically reasonable, candidate of meaning of a writing. [Citations.] An ambiguity can be patent, arising from the face of the writing, or latent, based on extrinsic evidence.' [Citation.] . . . If an ambiguity as to the scope of the release exists, it should normally be construed against the drafter. [Citations.] [¶] . . . The express terms of the release must be applicable to the particular negligence of the defendant, but every possible specific act of negligence of the defendant need not be spelled out in the agreement. [Citation.] When a release expressly releases the defendant from any liability, it is not necessary that the plaintiff have had a specific knowledge of the particular risk that ultimately caused the injury. [Citation.] If a release of all liability is given, the release applies to any negligence of the defendant. ' "It is only necessary that the act of negligence, which results in injury to the releasor, be reasonably related to the object or purpose for which the release is given." ' [Citation.] The issue is not whether the particular risk of injury is inherent in the recreational activity to which the release applies, but rather the scope of the release. [Citations.]" (*Benedek, supra,* 104 Cal.App.4th at pp. 1356–1357, fn. omitted.)

General releases of liability by members of health clubs have been enforced by several courts. In a particularly instructive case, the Second District held that a YMCA release effectively barred the claim of a plaintiff who enrolled in a swimming class at a local YMCA and hurt herself when she slipped and fell on wet poolside tile. (*Randas v. YMCA of Metropolitan Los Angeles* (1993) 17 Cal.App.4th 158, 160, 162–163.) The plaintiff had " 'RELEASE[D] . . . the YMCA . . . from all liability to the undersigned . . . for any loss or damage . . . on account of injury to . . . the undersigned . . . caused by the

11

negligence of the [YMCA] . . . .' " (*Id.* at p. 163.) Because the release was clear and unambiguous, the court concluded that it effectively relieved the YMCA of liability, even assuming the YMCA was negligent in failing to keep the tile on the poolside dry. (*Ibid.*[7]; see also *Lund v. Bally's Aerobic Plus, Inc.* (2000) 78 Cal.App.4th 733, 735–739 [no liability for injury during personal trainer weightlifting session where release provided, " 'You agree . . . to release and discharge us . . . from any and all claims . . . arising out of our negligence[,] . . . [including] your use of any exercise equipment or facilities . . . [or] our negligent instruction or supervision' "]; *Sanchez v. Bally's Total Fitness Corp.* (1998) 68 Cal.App.4th 62, 64–65, 66–67 [no liability for club member's injury from slip and fall on slide aerobic mat during exercise class where release provided, " 'the fitness center shall not be liable for any claims for injuries or damages whatsoever to person or property of the member . . . arising out of or connected with the use of the fitness center' " even though release did not use the word "negligence"]; cf. *Zipusch v. LA Workout, Inc., supra,* 155 Cal.App.4th at pp. 1284–1285, 1289–1290 [club did not effectively release itself from liability where release referred to negligence of the member or others using the club, but not unambiguously to the club itself]; *Celli v. Sports Car Club of America, Inc.* (1972) 29 Cal.App.3d 511, 518–519 [release did not clearly and unambiguously release sports provider from liability for its own negligence].)

The release in this case is similar to that enforced in *Randas v. YMCA of Metropolitan Los Angeles, supra,* 17 Cal.App.4th 158. Naser "agree[d] to voluntarily assume all liability . . . for any death, injury, or damage suffered by . . . the Member, arising out of the Member's activities at [Lakeridge] even if death, injury, or damage is

---

[7] The Second District held a release did *not* absolve a fitness club from liability for a member's slip and fall on the club's pool deck. (*Capri, supra,* 136 Cal.App.4th at pp. 1081–1082.) The material distinction in that case was that the plaintiff alleged a cause of action for *negligence per se* premised on a violation of health and safety statutes, and Civil Code section 1668 prohibits a party from contracting away liability for negligent violations of statutory law. (*Capri,* at pp. 1083–1085.) The *Capri* plaintiff's *ordinary* negligence claim based on the fall *was* barred by the release. (*Id.* at p. 1084.) Here, Naser's claim is only for ordinary negligence, not negligence per se.

12

caused by [Lakeridge's] own passive or active negligence."  The language is clear and unambiguous, and it effectively relieves Lakeridge generally of liability for its own negligence with respect to injuries arising out of Naser's activities at Lakeridge.

Releases as to injuries arising from alleged premises liability, rather than arising directly from the member's fitness or other recreational activities, have also been enforced.  In *Benedek*, the plaintiff injured himself while attempting to adjust the angle of a television in the exercise room.  (*Benedek, supra,* 104 Cal.App.4th at p. 1355.)  The plaintiff had signed a " 'complete release of any responsibility for personal injuries . . . sustained by any MEMBER . . . while on the . . . premises, whether using exercise equipment or not.' " (*Id.* at p. 1354, original underscoring.)  The court held the release was clear and unambiguous and enforceable against the plaintiff.  (*Id.* at p. 1358.)  In another case, a 73-year-old plaintiff injured herself while attending a recreational program for seniors that included lunch, socializing and shopping opportunities at the YMCA:  she fell down stairs when walking by vendors' tables, which were set up near a stairway.  (*YMCA of Metropolitan Los Angeles v. Superior Court* (1997) 55 Cal.App.4th 22, 24–26.)  The plaintiff had signed a release "for any personal injury resulting from the YMCA's negligence regarding its premises, facilities, or equipment." (*Id*. at p. 26)  The court held that enforcement of the release was not contrary to public policy.  (*Id.* at p. 27; see also *Benedek,* at pp. 1356–1357 ["exculpatory agreements in the recreational sports context do not implicate the public interest and therefore are not void as against public policy"].)

Here, the Release signed by Naser relieved Lakeridge of all liability for its negligence for any injury arising out of her activities at the club.  The Release is not limited to the inherent risks of exercise and expressly provided that it was "[i]n consideration of permitting this member to join this Club or to participate in exercise activity and/or instruction at these premises (*including the entire indoor area and outdoor parking area*)." (Italics added.)  We agree with the trial court that Naser's use of the locker room was an activity at Lakeridge that was covered by the Release.

13

In an apparent attempt to distinguish the aforementioned cases, Naser argues her case is akin to *Leon, supra,* 61 Cal.App.4th 1227. We are not persuaded. In *Leon*, a health club member was injured when he lay on a bench in the club's sauna and the bench collapsed. (*Id.* at p. 1231.) The court held a written release was unenforceable on the facts of that case for several reasons. First, as noted *ante*, the court held the release was not sufficiently conspicuous on the membership agreement. (*Id.* at pp. 1232–1233.) We have already found that Naser forfeited any argument that the Release was insufficiently conspicuous and that in any event such an argument appeared to be meritless. Second, the *Leon* court held that the release did not clearly and unambiguously relieve the club of liability for its own negligence with respect to risks that were not inherent in use of a health club, such as the collapse of a sauna bench.[8] (*Id.* at pp. 1234–1235). Here, the Release is not written in such a way as to suggest it was limited to releasing liability for risks inherent in an exercise or sports program. Moreover, the consideration clause of the Release specifically refers to the entire premises of the club, including areas not intended for exercise such as the parking lot. The language of the Release is materially distinguishable from the language of the release at issue in *Leon*.

Naser seizes on certain language in *Leon,* taken out of context, to suggest that a nonspecific general release of all liability for a health club's negligence is effective only as to the inherent risks of exercise. Explaining why the exculpatory clause of the release in that case was ineffective despite ample authority for enforcing such releases in the sports and recreation context, the *Leon* court acknowledged: " 'Not every possible specific act of negligence by the defendant must be spelled out in the agreement or

---

[8] "The release begins with language that participation in a sport or physical exercise may result in accidents or injury, and buyer assumes the risk connected with the participation in such. The release is followed by a statement in large print and bold, capital letters: 'Moderation Is the Key to a Successful Fitness Program and Also the Key to Preventing Injuries.' [The club] placed the general waiver between these two statements which deal strictly with the risks inherent in an exercise or sports program without any mention that it was intended to insulate the proprietor from liability for injuries caused by its own negligence." (*Leon, supra,* 61 Cal.App.4th at p. 1235, capitalization omitted.)

14

discussed by the parties. . . . Where a release of all liability for *any* act of negligence is given, the release applies to any such negligent act, whatever it may have been. . . . "*It is only necessary that the act of negligence, which results in injury to the releasor, be reasonably related to the object or purpose for which the release is given.*" ' (*Paralift, Inc. v. Superior Court* [(1993)] 23 Cal.App.4th [748,] 757, italics added.) Here, [the club's] negligence was not reasonably related to the object or purpose for which the release was given, that is, as stated, injuries resulting from participating in sports or exercise rather than from merely reclining on the facility's furniture. (See *Bennett v. United States Cycling Federation*[ (1987)] 193 Cal.App.3d [1485,] 1490.)" (*Leon, supra,* 61 Cal.App.4th at pp. 1234–1235.) Naser characterizes *Leon* as refusing to enforce the release because the plaintiff "was hurt not while exercising, but while reclining on a supposedly permanent bench." Similarly, she argues, her own injuries "were proximately caused [not by her own exercise] but by [Lakeridge's] active negligence in failure to provide safety mats in the locker room."

The test applied in *Leon*, however, was not whether the risk faced by plaintiff was inherent in her exercise activities (the test for primary assumption of risk—for which no release is necessary), but whether the risk was reasonably related to the release's purpose as indicated by its *terms*. In *Leon*, the terms of the release did nothing more than reiterate the common law rule that the club was not liable for the inherent risks of exercise. Therefore, the release did not apply to the collapse of a sauna bench, which was not related to inherent risks of exercise. Here, we have no difficulty concluding that slipping on a wet locker room floor was reasonably related to the purposes of the Release signed by Naser, which relieved Lakeridge of all liability for its negligence leading to any injury arising out of Naser's activities at the club. The locker room is designed for people to change in and out of swimsuits, including wet swimsuits after time in the pool, and for people to dress and undress, including dressing after a shower. *Leon* itself observes that "slipping in the locker-room shower" is a "hazard known to relate to the use of . . . health club facilities." (*Leon, supra,* 61 Cal.App.4th at p. 1234.) The trial court properly held

15

that Naser's claim against Lakeridge for injuries arising from her fall in the club locker room is barred by the Release as a matter of law.

B.    *Motion to Tax Costs*

After the trial court entered judgment, Lakeridge filed a $9,647 memorandum of costs. It sought filing and motion fees (which Naser does not contest), a $150 jury fee, and $8,602 in deposition costs. The deposition costs included the direct costs of taking three depositions, for a total of $1,604, to which Naser did not object. Naser moved to tax costs, arguing the jury fee was unwarranted as there was no jury trial in the case, and the bulk ($6,998) of the claimed deposition costs should have been disallowed as costs of photocopying her medical records. Lakeridge opposed the motion, arguing the jury fee was a reasonable and necessary cost of litigation, and the contested deposition costs were allowable as costs of "serving and processing *deposition subpoenas*" for production of business records in lieu of a personal appearance by the custodian of records, pursuant to Code of Civil Procedure sections 2020.020 and 2020.410.[9] Even if these deposition costs were not automatically allowable under the cost statute, Lakeridge argued, the court should allow them in its discretion as reasonable and necessary to the conduct of the litigation and as reasonable in amount. The court denied Naser's motion to tax and awarded Lakeridge the requested amount.

Generally, a prevailing party is "entitled as a matter of right to recover costs." (§ 1032, subd. (b).) It is not disputed that Lakeridge was the prevailing party below. (See *id.*, subd. (a)(4) [" '[p]revailing party' includes . . . a defendant as against those plaintiffs who do not recover any relief against that defendant"].) As relevant here, allowable costs include "(1) Filing, motion and jury fees. [¶] . . . [¶] (3) Taking, video recording, and transcribing necessary depositions including . . . travel expenses to attend depositions. [¶] (4) Service of process . . . ." (§ 1033.5, subd. (a).) Costs that are not generally allowable include "[p]ostage, telephone, and photocopying charges, except for

---

[9] All further statutory references are to the Code of Civil Procedure section unless otherwise indicated.

16

exhibits." (§ 1033.5, subd. (b)(3).)  Section 1033.5 further provides that "[a]llowable costs shall be reasonably necessary to the conduct of the litigation rather than merely convenient or beneficial to its preparation . . . [¶] . . . [and] shall be reasonable in amount. [¶] . . . Items not mentioned in this section and items assessed upon application may be allowed or denied in the court's discretion."  (*Id.*, subd. (c)(2)–(4).)

"Whether a cost item was reasonably necessary to the litigation presents a question of fact for the trial court and its decision is reviewed for abuse of discretion.  [Citation.] However, because the right to costs is governed strictly by statute [citation] a court has no discretion to award costs not statutorily authorized.  [Citations.]" (*Ladas v. California State Auto. Assn.* (1993) 19 Cal.App.4th 761, 774.)  Whether a cost is statutorily authorized is a question of law we review de novo.  (*Baker-Hoey v. Lockheed Martin Corp.* (2003) 111 Cal.App.4th 592, 596.)

1.      *The Jury Fee*

We affirm the court's allowance of the $150 jury fee, as provided under section 1033.5, subdivision (a)(1).  Naser argues the fee was not reasonable and necessary to the conduct of the litigation because a jury trial never took place.  However, Lakeridge was required to pay the fee in order to preserve its right to a jury trial.  A party's right to a jury trial is waived unless the party pays a nonrefundable $150 jury fee on or before the date scheduled for the initial case management conference in the action. (§ 631, subds. (b), (c), (f)(5).)  The date of the initial case management conference in this action was in June 2011.  Summary judgment was not granted until February 2013. Lakeridge could not have known in June 2011 that a jury trial would be unnecessary. The fee was a reasonable litigation expense and was recoverable under section 1033.5, subdivision (a)(1).

2.      *Records Deposition Costs*

Lakeridge claims the disputed deposition costs for "serving and processing" subpoenas pursuant to sections 2020.020 and 2020.410 were for copies of Naser's records from numerous health care providers and nonretained experts identified in her pretrial disclosures.  Naser does not contend that the records were unnecessary to the

17

litigation or that the costs were unreasonable, but only claims that these are unallowable photocopying costs under section 1033.5, subdivision (b)(3) and were unnecessary to the scope of the summary judgment motion.

The parties have not cited, and we cannot find, any direct authority on whether section 1033.5, subdivision (a)(3) applies to the costs of serving and processing deposition subpoenas for the production of business records without an in-person appearance of the custodian of records. However, the statutory provision refers to the costs of "[t]aking, video recording, and transcribing necessary *depositions* . . . and travel expenses to attend depositions."

The Civil Discovery Act (§ 2016.010 et. seq.) specifies the methods for obtaining discovery within the state from "a person who is not a party to the action in which the discovery is sought: (1) An oral deposition under Chapter 9 (commencing with Section 2025.010). [¶] (2) A written deposition under Chapter 11 (commencing with Section 2028.010). [¶] (3) A *deposition* for production of business records and things under Article 4 (commencing with Section 2020.410) or Article 5 (commencing with Section 2020.510). [¶] (b) Except as provided in subdivision (a) of Section 2025.280, the process by which a nonparty is required to provide discovery is a *deposition* subpoena." (§ 2020.010, italics added; see also § 2020.020, subd. (b) [authorizing issuance of a deposition subpoena for "production of business records for copying" pursuant to § 2020.410.]) The deposition subpoena for business records directs a nonparty's "custodian" of records to deliver a copy of the requested documents to a "deposition officer" or to make the original documents available to the subpoenaing party for inspection and copying. (§§ 2020.410, subd. (c), 2020.430, subds. (a)–(e).) The Civil Discovery Act refers to the custodian of records as the "deponent." (§§ 2025.280, subd. (b), 2020.230, subd. (b)). "A deposition subpoena which seeks only business records simply allows a party to obtain these records without the formality of requiring the testimony of the custodian." (*California Shellfish Inc. v. United Shellfish Co.* (1997) 56 Cal.App.4th 16, 21 (*Shellfish*).)

At least two courts have concluded that the Civil Discovery Act contemplates that discovery conducted by way of a business records subpoena is a "deposition." (*Unzipped Apparel, LLC v. Bader* (2007) 156 Cal.App.4th 123, 131; *Shellfish, supra,* 56 Cal.App.4th at p. 21.) The Second District Court of Appeal found that a motion to compel production of subpoenaed documents, required to be filed "no later than 60 days after the completion of the record of the deposition" (§ 2025.480, subd. (b)) applied to a motion filed after objections were filed in response to a business record deposition subpoena, "because a response to a business records subpoena, namely, objections, is a 'record of the deposition.' " (*Unzipped Apparel, LLC v. Bader,* at p. 127.) *Shellfish* involved the application of the 20-day "deposition hold," which precludes a plaintiff from serving a "deposition notice" until "20 days after the service of the summons on, or an appearance by, any defendant." (§ 2025.210, subd. (b).) Division One of this court found that in the context of the Civil Discovery Act "it is clear that a deposition subpoena seeking business records is included in the category of 'oral deposition' covered by [former] section 2025" and that the 20-day hold thus applied. (*Shellfish,* at p. 23.)

We agree that obtaining business records through a deposition subpoena is a "deposition" within the plain meaning of the Civil Discovery Act. Naser's medical records were clearly relevant to her personal injury claim, and Lakeridge was entitled to depose the custodian of records for each of Naser's health care providers and potential experts. Although the scope of the summary judgment motion was more narrow than the potential issues that might arise at trial, Lakeside was entitled to conduct discovery necessary to prepare for trial and to recover those cost after prevailing in the action. It would be anomalous to deny costs where Lakeridge utilized a more economical procedure.

### III.    DISPOSITION

The judgment is affirmed. Naser shall bear Lakeridge's costs on appeal.

19

_____
Bruiniers, J.

We concur:


_____
Jones, P. J.


_____
Simons, J.

A138353

Superior Court of Contra Costa County, No. MSC11-00211, Steven K. Austin, Judge.

Law Office of Michael R. Loewen, Michael R. Loewen and Noah Freeman Schwinghammer for Plaintiff and Appellant.

Ericksen Arbuthnot, Joseph J. Minioza, Jason W. Mauck and Gregory A. Mase for Defendant and Respondent.